UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FORD MOTOR CO.,

       Plaintiff,

v.                                                               Case No. 86-74100
                                                                Honorable Patrick J. Duggan

POWERFLOW, INC.,

       Defendant.

_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on August 2, 2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

In 1986, Plaintiff Ford Motor Company ("Ford") sued Defendant Powerflow, Inc.

("Powerflow"), alleging that Powerflow was manufacturing, distributing, and selling in

the United States automobile accessories, namely splash guards, bearing Ford's

trademarks.  The parties subsequently engaged in settlement negotiations and eventually

reached the terms of a Settlement Agreement, which was executed in January 1988.  A

Consent Judgment, stipulated to by the parties and signed by this Court, was entered on

January 27, 1988.  Currently pending before the Court are the following four motions

arising from Ford's belief that Powerflow is violating or has violated the Consent

Judgment and Settlement Agreement:

1

•Ford's Motion for Order to Show Cause Why Powerflow
Should Not Be Held in Contempt of the Court's Consent
Judgment and Permanent Injunction ("Contempt Motion"),
filed June 24, 2005;
•Powerflow's Renewed Motion to Dismiss Ford's Motion for
Order to Show Cause Based Upon Laches, filed April 3,
2006;
•Powerflow's Motion to Dismiss Ford's Motion for Order to
Show Cause Based Upon Failure to Procedure, filed April 3,
2006; and,
•Ford's Motion to Enforce Settlement Agreement Against
Powerflow, filed April 27, 2006.

The Court held a hearing on these motions on July 13, 2006.

## I.   Factual and Procedural Background

Powerflow, incorporated in 1978, is a New York Corporation with its principal

place of business in Buffalo, New York.  When Ford filed its complaint in 1986, Douglas

Ward was the President of Powerflow and owned fifty percent of the stock in the

corporation.  The remaining fifty percent was owned by Douglas Bevins.  In 1995, when

Mr. Bevins retired, Mr. Ward purchased Mr. Bevin's stock in Powerflow.

Mr. Ward also is the President and sole stockholder of a Canadian Corporation,

Powerflow Products Limited ("Powerflow Products").  Mr. Bevins incorporated

Powerflow Products under the name D.L. Bevins (Canada) Limited in 1962; the name

was changed to Powerflow Products in 1970.  Mr. Ward purchased Powerflow Products

from Mr. Bevins in 1995.  Powerflow Products has its principal place of business in

Toronto, Canada, and sells splash guards and other automotive accessories in Canada,

only.

According to Mr. Ward, Powerflow and Powerflow Products are separate, independent companies, conducting their business in their respective countries.  Each company has its own management and employees.  *See* Def.'s Resp. to Pl.'s Contempt Mot. Att. 1 ¶ 1.  Other than Mr. Ward, the companies have no employees in common.  *See* Def.'s Reply to Mot. to Dismiss for Failure to Prosecute, Ward Dep. at 54:20-25.

When Ford sued Powerflow in 1986, Ford was represented by its senior in-house counsel Clifford "Kip" Sadler and outside counsel Dave Hilliard.  Powerflow was represented by Tom Fisher of the Cleveland, Ohio law firm of Watts, Hoffmann, Fisher & Heinke Co.– currently named Watts Hoffmann Co. and Powerflow's counsel.  Mr. Sadler, Mr. Hilliard, and Mr. Fisher negotiated the terms of the Settlement Agreement and Consent Judgment entered in January 1988.

In the Settlement Agreement, Powerflow agreed to wind down and, by early March 1989, cease "using any of the Ford trademarks or designs on or in connection with the manufacture, promotion, advertising, marketing, distribution or sale of automotive parts or accessories not manufactured by Ford or with its authorization . . ."  *See* Settlement Agreement ¶ 2.  Powerflow also agreed to pay Ford a total sum of $15,000.  *See id.* ¶ 4.  The Settlement Agreement references and incorporates the terms of a Consent Judgment to be entered into by the parties and provides that the Settlement Agreement will be binding upon the parties and "their successors, assigns, affiliates and subsidiaries, including their officers, agents, servants, and employees, and all persons in

3

active concert or participation with them." *See id.* ¶¶ 1 & 5.

The Consent Judgment, signed by the Court on January 27, 1988, contains most of the same language as the Settlement Agreement, although it does not refer to Powerflow's agreement to pay a sum of money to Ford. The Consent Judgment, however, includes the following injunctive language which is not contained in the Settlement Agreement:

> Defendant and its officers, agents, servants, and employees, and all persons in active concert or participation with them, individually or jointly, are permanently enjoined and restrained in the United States from:
>
> a.      manufacturing, distributing or selling products bearing [Ford's] trademarks . . .
>
> . . .
>
> d.      assisting, aiding or abetting any other person or business entity in engaging in any of the activities prohibited in sub-paragraphs a, b and c above . . .

*See* Consent Judgment ¶ 11. The Consent Judgment does not specifically incorporate or refer to the parties' Settlement Agreement.

Mr. Ward attests that, following the execution of the Settlement Agreement and Consent Judgment and the limited winding-down period set forth in both, Powerflow discontinued manufacturing, distributing, and selling products bearing Ford's trademarks. *See* Def.'s Mot. to Dismiss Based on Laches. Ex. 2 ¶ 6. Mr. Ward acknowledges, however, that his Canadian corporation, Powerflow Products manufactures, distributes,

4

and sells splash guards bearing the FORD trademark.  *See id.* ¶ 7.  Those splash guards

are distributed and sold only in Canada.  Prior to June 2004, however, the splash guards

were manufactured by a company located in Buffalo, New York, called Staroba Plastic

and Metal, Inc. ("Staroba").  Powerflow also used Staroba as its splash guard

manufacturer.  In June 2004, Powerflow Products and Powerflow began using a different

splash guard manufacturer, Plastics Plus, which is located in Hamilton, Ontario, Canada.

*See* Def.'s Reply to Mot. to Dismiss for Failure to Prosecute, Ward Dep. at 95-97.

In October 2000, Ford's Global Brand Licensing Manager, Keith Hughes, sent a

letter to Powerflow, accusing it of promoting and displaying Ford's trademarks.  *See*

Def.'s Mot. to Dismiss Based on Laches, Ex. 7.  According to the letter, Mr. Hughes'

accusations were based on information obtained at a trade show in Canada– specifically a

display of splash guards bearing the FORD trademark which contained Powerflow's

name on the packaging.  Mr. Fisher, Powerflow's counsel at the time, responded to Mr.

Hughes' letter.  *See id.* Ex. 9

In a letter dated November 27, 2000, apparently following a telephone

conversation with Mr. Hughes, Mr. Fisher asserts that Powerflow does not do business in

Canada and that it "has lived up to the letter and spirit of [the parties' Settlement]

Agreement."  *See id.*  Apparently having already informed Mr. Hughes that the product

seen at the Canadian trade show was that of Powerflow Products, Mr. Fisher includes a

letter to Ford from Mr. Ward, on behalf of Powerflow Products, requesting a license to

sell splash guards bearing Ford's trademarks in Canada.  *See id*.  According to Mr.

Fisher's letter, Mr. Ward made the same offer to Ford at the time of the initial lawsuit.

*See id*.  As Mr. Fisher explains that offer, as well as Powerflow Products' position

regarding the legality of its sale of goods marked with Ford's trademarks in Canada:

> At that time of the law suit, we raised the question of the
> Canadian market.  Mr. Ward suggested that if Powerflow
> Products Limited were licensed, it would assist Ford Motor
> Company in policing the market.  The trademarks of Ford
> Motor Company and other automobile manufacturers had
> been widely used on aftermarket products since well prior to
> the time when Powerflow Products entered into the splash
> guard business about 1975.
>
> Mr. Ward made the offer in spite of the fact that we had
> opinion from Canadian counsel that under Canadian Law,
> Ford Motor Company could not stop the several Canadian
> purveyors of splash guards bearing Ford Motor Company
> trademarks as decoration from continuing to do so.  Canadian
> counsel's opinion was that the trademark FORD while a
> perfectly valid trademark for automobiles and structural parts
> thereof, was not a trademark for splash guards due to the long
> standing continuous, open and notorious use of the word
> FORD and other Ford Motor Company trademarks as
> decoration on splash guards.
>
> We suggest you may wish to speak with Kip Saddler, who I
> understand is now retired, or to Dave Hilliard who was the
> outside counsel in the case against Powerflow Incorporated to
> determine why, nearly a decade and a half ago, Ford Motor
> Company elected to ignore the Canadian situation and allow
> the widespread utilization of FORD and other Ford Motor
> Company trademarks on splash guards and other
> aftermark[et] products to continue unabated.

*See id*.  Ford did not respond to Mr. Fisher's or Mr. Ward's letters.

Approximately a year and a half later, on July 25, 2002, Ford's current outside counsel, Scott Ryther, sent a letter to Powerflow again accusing it of manufacturing, marketing, and advertising splash guards bearing Ford's trademarks and demanding that Powerflow execute an attached agreement providing *inter alia* that it will cease using Ford's trademarks in connection with splash guards or any other products. *See* Def.'s Mot. to Dismiss Based on Laches, Ex. 10. Mr. Fisher responded to Mr. Ryther on August 5, 2002, stating in part: "Obviously your client is so large that it has lost track of what litigation it has conducted against after market vendors." *See id*. Ex. 11. Expecting that Mr. Ryther was unaware of Ford's 1986 lawsuit and the ensuing settlement, Mr. Fisher provided Mr. Ryther with a copy of the Consent Judgment and asserted that Powerflow "is and has been in compliance with its obligations under the Consent Judgment." *See id*. Mr. Ryther sent a letter in response on August 20, 2002, indicating that Ford has discovered information indicating that Powerflow in fact is infringing its trademarks, specifically splash guards, which Mr. Ryther indicates he has in his possession, which bear the trademark FORD and are contained in packaging bearing the following markings: "©Copyright 2000, Powerflow, Inc." and "www.powerflowinc.com." *See id*. Ex. 12.

On August 27, 2002, Mr. Fisher sent a response to Mr. Ryther in which he explained the product referenced in the latter's August 20 letter:

> The product in question was made in the United States by a
> subcontractor of Powerflow Products Limited of Toronto,

7

> Ontario, Canada.  The product was packaged in Canada two
> years ago.
>
> . . .
>
> There may be some confusion here because the Powerflow
> companies have standardized the printed message on their
> packaging and have supplied the address of both companies
> on the standard packaging.  While the verbiage on the
> package represented by the attachments to your letter of
> August 20, 2002 is standard, the package is not.  The package
> in question is Canadian made primarily for, indeed if not
> exclusively for, Canadian Tire.

*See id*. Ex. 13.  Apparently, however, Mr. Ryther was not convinced by Mr Fisher's

representations, indicating in a letter to Mr. Fisher dated August 30, 2002, that "[i]t

appears more information is needed before I can fully advise my client in this matter."

*See id*. Ex. 14.  Specifically, Mr. Ryther requested information concerning the

relationship between Powerflow and Powerflow Products and "the identity and location

of the 'subcontractor' who produced the product in the United States for Powerflow

Products Limited."  *See id*.  Mr. Fisher suggests in a letter to Mr. Ryther on September

10, 2002, that Mr. Ryther should consult with Ford personnel who can answer his

inquiries and that he "therefore should not ask us."  *See id*. Ex. 15.  Neither Powerflow

nor its counsel thereafter received any direct communication from Ford or its counsel.

Mr. Fisher passed away in January 2005, at which time George Pinchak of the

same firm took over the representation of Powerflow.  On June 23, 2005, without first

notifying Powerflow or its counsel, Ford filed its Contempt Motion.  Powerflow

thereafter filed a motion to dismiss Ford's motion based on laches. The Court scheduled a

hearing on the motions for July 28, 2005.

At the hearing, Ford indicated that it now knew that Powerflow was not selling the

accused splash guards in Canada.  *See* Ryther Decl. Ex. C at 5.  Ford indicated, however,

that it lacked sufficient information to know whether Powerflow was assisting Powerflow

Products in the United States either by being involved in some way in the manufacture of

the splash guards or by assisting in the distribution of the splash guards by receiving

them from Staroba in the United States and then shipping them to Powerflow Products.

*See* Def.'s Mot. to Dismiss, Decl. of Scott R. Ryther, Ex. C. at 5-6.  Ford therefore sought

to conduct some discovery before deciding whether to pursue its Contempt Motion,

particularly with regard to the relationship between Powerflow and Powerflow Products

and both companies' relationship with Staroba.  *See id*. at 7.  Specifically, Ford requested

the following discovery: the deposition of Mr. Ward as a Rule 30(b)(6) witness for both

Powerflow companies, the deposition of a representative from Staroba, and Rule 34

requests for production of documents from both Powerflow companies and Staroba.  *See*

*id*. at 16-17.  The Court granted Ford's request.  *See id*. at 19-22.

Disputes regarding Ford's discovery requests thereafter developed, precipitating

Ford's filing of a motion to compel which was heard by the Court on October 6, 2005.

At the Court's insistence, counsel for Ford and Powerflow first met in the Court's jury

room in order to discuss their discovery disputes.  Through those discussions, the parties

9

worked out several of their discovery disputes.  An issue remained, however, with regard

to Ford's request for discovery from Staroba.  The Court granted Ford additional time to

conduct that discovery, but requested of Ford's counsel: "Give me a letter from you,

Counsel, as to the progress on Staroba, exactly what's going on, with obviously copies to

[Powerflow's counsel] so that I have a little timetable on it, because, you know – it's

your motion, right?" *See* Def.'s Mot. Dismiss for Failure to Prosecute, Ex. B at 17.  The

Court also instructed Ford's counsel to "move as expeditiously as possible to get the

discovery and/or depositions [of Staroba]."  *See id*.

Subsequent to the hearing on October 6, 2005, Ford completed its discovery with

respect to the Powerflow companies.  Ford, however, never sent a letter to the Court or

opposing counsel regarding the progress of its Staroba discovery.  According to

Powerflow, it appears that Ford never conducted any further discovery with respect to

Staroba.

On April 3, 2006, after a period of inactivity in the case, Powerflow filed its

renewed motion to dismiss Ford's contempt motion based on laches.[1]  On the same date,

Powerflow filed its motion to dismiss for failure to prosecute.  On April 27, 2006, Ford

filed its motion to enforce the parties' Settlement Agreement.[2]

---

[1]In light of the discovery to be conducted, after the hearing on July 28, 2005, the
Court dismissed without prejudice Powerflow's initial motion to dismiss based on laches.

[2]Perhaps to explain why it filed its motion to enforce the Settlement Agreement
almost a year after its Contempt Motion, Ford's counsel, Mr. Ryther, states that he only
became aware of the Settlement Agreement when he deposed Mr. Ward and "Mr. Ward

**II.     Ford's Arguments to Support its Contempt Motion and Motion to Enforce the Settlement Agreement and Powerflow's Response**

With regard to the Settlement Agreement, Ford contends that the agreement is binding upon Powerflow Products and Mr. Ward and that both undisputedly have manufactured, distributed, and sold splash guards bearing Ford's trademarks.  Ford relies on Paragraph Five of the Settlement Agreement which provides that the agreement is binding on Powerflow's "affiliates" and "officers." According to Ford, Powerflow Products (as Powerflow's affiliate) and Mr. Ward (as a Powerflow officer) violated the agreement by manufacturing FORD splash guards in the United States.  Ford further contends that the absence of language restricting the terms of the agreement to activity in the United States renders Powerflow Products' and Mr. Ward's activities in Canada a violation of the agreement, as well.

With regard to the Consent Judgment, which expressly enjoins activity in the United States only, Ford argues that Powerflow and Mr. Ward violated the injunction by "assisting, aiding or abetting" Powerflow Products in manufacturing and distributing FORD splash guards.

---

admitted to [Mr. Ryther] that a Settlement Agreement from 1988 existed." *See* Ryther Decl. ¶ 8.  Mr. Ryther states that he is "shocked at Mr. Ward's and his counsel's apparent attempt to conceal from this Court's view a Settlement Agreement directly governing the parties' resolution of claims in this matter (dating back to 1988), and that was entered in conjunction with the Consent Judgment that has been the very subject of Ford's Contempt Motion." *See id*. ¶ 9.  The Court finds this argument surprising in light of the fact that the other party to the Settlement Agreement, which presumably would have a copy of the agreement, was Ford– Mr. Ryther's own client.

11

Powerflow argues that it has not breached the terms of the Settlement Agreement or Consent Judgment and that Powerflow Products and Mr. Ward, in his capacity as an officer of Powerflow Products, are not bound by either document.  With regard to the Settlement Agreement, Powerflow also argues that this Court lacks subject matter jurisdiction to enforce the agreement.  Powerflow further argues that Ford's Contempt Motion should be dismissed due to Ford's delay in filing the motion after discovering the conduct which is the basis for the motion and due to Ford's failure to thereafter prosecute the motion.  Presumably the same arguments apply to Ford's motion to enforce the Settlement Agreement.

### III.    Whether the Court has Subject Matter Jurisdiction to Enforce the Settlement Agreement

Relying on the Supreme Court's decision in *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375, 114 S. Ct. 1673 (1994), Powerflow argues that the Court lacks the power to enforce the parties' Settlement Agreement because the agreement does not contain language retaining the Court's jurisdiction.  In *Kokkonen*, the parties in a diversity action entered into a settlement agreement which they orally placed on the record.  511 U.S. at 376, 114 S. Ct. at 1675.  The parties then executed a "Stipulation and Order of Dismissal with Prejudice."  *Id*. at 377, 114 S. Ct. at 1675.  The Stipulation and Order did not reserve jurisdiction in the district court and did not refer to the settlement agreement.  *Id*.  When one of the parties thereafter moved to enforce the agreement, the other party argued that the district court lacked subject matter jurisdiction;

12

the Supreme Court agreed.  *Id.*

The Court explained that "[f]ederal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute . . . which is not to be expanded by judicial decree . . ." *Id.* (citations omitted).  Enforcement of the settlement agreement, the Court explained, requires its own basis for subject matter jurisdiction, separate from the court's basis for jurisdiction in the dismissed suit.  *Id.* at 378, 114 S. Ct. at 1675-76.

The *Kokkonen* Court found no independent basis for the district court to exercise subject matter jurisdiction to enforce the settlement agreement at issue.  In doing so, however, the Court set forth circumstances where the district court would have subject matter jurisdiction:

> The situation would be quite different if the parties'
> obligation to comply with the terms of the settlement
> agreement had been made part of the order of dismissal–
> either by separate provision (such as a provision "retaining
> jurisdiction" over the settlement agreement) or by
> incorporating the terms of the settlement agreement in the
> order.  In that event, a breach of the agreement would be a
> violation of the order, and ancillary jurisdiction to enforce the
> agreement therefore would exist.

*Id.* at 381, 114 S. Ct. at 1677.  Absent the parties' expression of their desire to provide for the court's enforcement of a settlement agreement, the *Kokkonen* Court indicated that "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Id.* at 382, 114 S. Ct. at 1677.

In the pending matter, the Settlement Agreement does not contain a provision retaining this Court's jurisdiction over the agreement. The parties, however, incorporated almost all of the terms of the Settlement Agreement into the Consent Judgment, an order of the Court. The Court therefore concludes that it retained jurisdiction to enforce the Consent Judgment and ancillary jurisdiction to enforce the parties' Settlement Agreement.

**IV.     Whether the Doctrine of Laches Bars Ford's Requested Relief**

Powerflow asks the Court to dismiss Ford's Contempt Motion based on the doctrine of laches. According to Powerflow, in 1988, Ford knew that Powerflow Products– a company Ford also knew was related to Powerflow– was manufacturing and selling splash guards bearing Ford's trademarks. Powerflow further argues that, at least as of October 2000, Ford knew that splash guards manufactured in the United States were being marketed and sold by Powerflow Products. Ford responds that Powerflow cannot invoke the doctrine of laches because it has not acted in good faith. Specifically, Ford argues that "Mr. Ward, acting through both of his wholly-owned Powerflow companies, has done precisely what the Consent Judgment enjoined– manufacture and distribute counterfeit "FORD" splash guards in the United States." *See* Pl.'s Resp. to Def.'s Mot. to Dismiss Based on Laches at 3. Ford also argues that Powerflow cannot establish any prejudice as a result of Ford's alleged delay in filing its Contempt Motion.

"Laches is the 'negligent and unintentional failure to protect one's rights.'"

14

*Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)(quoting *Elvis Presley Enter., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)).  In the Sixth Circuit, laches only bars damages that occurred before the filing date of the lawsuit; it does not foreclose a plaintiff's right to injunctive relief and post-filing damages.  *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002)(citing *Kellogg Co. v. Exxon Corp.* 209 F.3d 562, 568 (6th Cir. 2000)).

A party asserting laches must show: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it."  *Herman Miller*, 270 F.3d at 320-21 (citing *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 367 (6th Cir. 1985)).  In the Sixth Circuit, there is a strong presumption that any delay by the plaintiff is reasonable provided the applicable state statute of limitations has not lapsed.  *Id.*  Conversely, it is "'presume[d]' that an action is barred if not brought within the period of the statute of limitations . . ."  *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985)(citations omitted).

For trademark cases in Michigan, the applicable statute of limitations is the three-year period for injury to personal property.  *Herman Miller*, 270 F.3d at 321 (citations omitted).  "[A] delay beyond the three-year statutory period is presumptively prejudicial and unreasonable."  *Nartron Corp.*, 305 F.3d at 408.  This period is measured from the time at which the plaintiff had "actual or constructive knowledge of the alleged infringing activity."  *Id.*; *see also Kellogg Co.*, 209 F.3d at 569-70 (citations omitted).

15

Powerflow maintains that, during the 1988 negotiations, Ford knew that Powerflow Products was selling splash guards bearing Ford's trademarks in Canada. As Powerflow has asserted in subsequent letters to Ford, during the settlement negotiations, Powerflow raised the issue of Powerflow Products' activities in Canada and took the position that those activities were lawful under Canadian Law. While the Court is not certain whether Ford knew then that the splash guards actually were being manufactured in the United States, in light of Ford's knowledge regarding Powerflow's manufacture and sale of accused splash guards and the known relationship between Powerflow and Powerflow Products, the Court believes Ford had constructive knowledge of Powerflow Products' conduct. In any event, Ford had actual knowledge that Powerflow Products was selling FORD splash guards that were manufactured in the United States in late 2000, when a Ford representative obtained the splash guards at a Canadian trade show. Despite this knowledge, Ford did not file its pending Contempt Motion until June 2005.

Ford argues that there was no delay because it took immediate action by sending a cease and desist letter to Powerflow. Ford's delay, however, is measured from the time it had actual or constructive knowledge of the wrongful activity until it instituted legal action, and that period is not tolled as a result of any intervening objections Ford made to Powerflow. *See Nartron Corp.*, 305 F.3d at 409 (measuring delay from the time the plaintiff was aware of the defendant's infringement until the date the plaintiff filed its lawsuit, despite the plaintiff's interim letters to the defendant demanding that the latter

16

cease using the plaintiff's trademark); *see also Herman Miller*, 270 F.3d at 304-05, 321-22 (same).  Ford waited almost five years after discovering the alleged infringing activity to file its Contempt Motion and therefore it is presumed that laches applies.

In order to overcome this presumption, Ford must: (1) rebut the presumption of prejudice; (2) establish that there was a good cause for its delay; or (3) show that Powerflow engaged in "particularly egregious conduct which would change the equities significantly in [Ford's] favor."  *Nartron Corp.*, 305 F.3d at 409. As indicated above, Ford argues that Powerflow has "unclean hands" based on its violation of the Consent Judgment and/or Settlement Agreement.  Ford also argues that Powerflow suffered no prejudice due to its delay.

Even if Ford is able to establish a breach of the Settlement Agreement or violation of the Consent Judgment, Ford has not presented any evidence to support its assertion that the Powerflow companies' "infringement of Ford's trademark rights in Canada is intentional and calculated."  *See* Pl.'s Resp. to Def.'s Motion to Dismiss Based on Laches at 9.  In other words, Ford has not demonstrated that Powerflow acted "egregiously" or in bad faith.

Ford further argues that Powerflow cannot establish prejudice resulting from Ford's delay in filing its Contempt Motion.  As an initial matter, Ford argues that Powerflow cannot claim any prejudice resulting from Ford's delay in filing its Contempt Motion because Ford's cease and desist letter put Powerflow on notice that Ford objected

17

to its conduct.  Several years of silence, however, followed Powerflow's response to Ford's cease and desist letter.  Under these circumstances, the Court believes that it would have been reasonable for Powerflow to conclude that Ford no longer believed that there had been a violation of the Settlement Agreement or Consent Judgment.  The Court finds such a conclusion particularly reasonable in this case because Powerflow's response to the cease and desist letter provided Ford with information concerning the accused infringing activity of which Ford presumably was not aware.

In its motion to dismiss, Powerflow argues that it has suffered the following prejudice as a result of Ford's delay in filing its Contempt Motion: (1) increased potential liability for damages; (2) loss of material witnesses, specifically due to the interim death of Powerflow's previous counsel Mr. Fisher and the retirement of Ford's in-house counsel Mr. Sadler; and (3) greater defense costs.  The Court concludes that Powerflow establishes prejudice due to Ford's delay.

First, if Ford had filed its motion closer to when it discovered the alleged infringing activity– specifically the manufacturing of FORD splash guards in the United States– Powerflow Products may have changed to a Canadian manufacturer earlier than June 2004.  If Powerflow or Powerflow Products is liable to Ford based on the manufacturing of FORD splash guards in the United States, the amount of damages will be greater than if Powerflow Products had changed its splash guard manufacturer earlier.  Second, Mr. Fisher could have testified about or attested to the information Powerflow

18

conveyed to Ford prior to the parties' execution of the Settlement Agreement and Consent Judgment regarding Powerflow Products' activities and the relationship between the Powerflow companies.  Mr. Fisher also could have testified to the parties' intent when they entered the Settlement Agreement and Consent Judgment with respect to Powerflow Products– i.e. whether they intended to prohibit Powerflow Products' activities and, if so, which activities. Finally, Powerflow's legal fees probably are greater as a result of Ford's delay.  Because Mr. Fisher passed away in the intervening five years, a new attorney had to reconstruct and review the case history and conduct meetings with Powerflow representatives.

For the above reasons, the Court concludes that the doctrine of laches bars Ford from recovering any damages for the alleged breach of the Consent Judgment and/or Settlement Agreement arising before Ford filed its Contempt Motion.  Because the Powerflow companies stopped using a United States manufacturer to produce their splash guards a year before Ford filed its Contempt Motion, Ford cannot recover any damages as a result of that activity.[3]  Ford only is entitled to relief if it can establish that subsequent activities of Powerflow or Powerflow Products constituted a violation of the Consent Judgment or Settlement Agreement.[4]

--------

[3]Despite this conclusion, the Court will address *infra* whether Powerflow Products' manufacture of splash guards in the United States constituted a violation of the Settlement Agreement or Consent Judgment.

[4]The Court does not believe that Ford's Contempt Motion should be dismissed based on its alleged failure to prosecute the motion.  First, in its Motion to Dismiss Ford's

**V.      Whether Ford Can Demonstrate a Violation of the Settlement Agreement
and/or Consent Judgment**

Ford argues that the following "facts" "demonstrat[e], without dispute," that

Powerflow violated the Settlement Agreement and/or Consent Judgment:

- Mr. Ward is the sole owner of Powerflow and Powerflow Products.
- Powerflow and Powerflow Products share a single Internet website, which
  is referenced on the packaging of both companies' products, including
  products bearing the FORD mark.
- Mr. Ward designed the packaging stating "Copyright 2000 Powerflow,
  Inc." and "Made in U.S.A." to be used by both Powerflow companies on
  their products.
- Employees of Powerflow and Powerflow Products regularly prepared a
  joint ordering report called a "Star Report" and sent this joint ordering
  document to Staroba for the purchase of splash guards, some of which bore
  the FORD trademark.
- Powerflow assisted Powerflow Products in shipping "FORD" splash guards
  from Staroba, in Buffalo, New York, to Canada.
- Powerflow Products obtained "FORD" splash guards from Staroba between
  1990 and 2004.

*See* Pl.'s Mot. to Enforce Settlement Agreement at 1-2.  According to Ford, these facts

demonstrate that Powerflow assisted, aided, or abetted Powerflow Products in the

manufacture and distribution in the United States of FORD splash guards.  Ford also

_____

Motion for Order to Show Cause Based Upon Failure to Prosecute, Powerflow primarily
relies on its argument that Ford failed to obey a Court order requiring it to keep the Court
and opposing counsel informed regarding its Staroba discovery.  While the transcript
from the October 6, 2005 hearing reflects this request, it does not reflect that the Court
specifically "ordered" Ford's counsel to do anything.  Second, while the Court seriously
questions whether Ford would have pursued its Contempt Motion in April 2006, but for
Powerflow renewing its motion to dismiss, the Court does not know this definitively and
it cannot conclude that the length of Ford's delay in prosecuting the motion justifies
dismissal.  The Court therefore is denying Powerflow's motion to dismiss based on
Ford's delay in prosecuting its Contempt Motion.

20

argues, however, that by manufacturing, distributing, and selling FORD splash guards, whether in the United States or Canada, Powerflow Products (as an "affiliate" of Powerflow") and Mr. Ward (as an officer of Powerflow) have violated the Settlement Agreement.

Ford presents insufficient evidence to convince the Court that Powerflow or Mr. Ward, as an officer of Powerflow, directly engaged in activities or assisted Powerflow Products in activities violating the Settlement Agreement or Consent Judgment. Nothing is demonstrated by the fact that Mr. Ward is the sole shareholder and president of both corporations, that the corporations share a common Internet website, or that Mr. Ward designed similar packaging to be used by both companies on their respective splash guards. With respect to Mr. Ward's activities, as the Court expressed on July 28, 2005, at the initial hearing on Ford's Contempt Motion, the fact that he is the sole shareholder and an officer of both companies does not mean that every activity in which he engages can be attributed to both companies.

Mr. Ward does not dispute that the Powerflow companies submitted a joint order form to Staroba for splash guards. He has explained, however, that an employee from Powerflow and an employee from Powerflow Products entered their respective company's requirements. *See* Ward Dep. at 196:14-25. In fact, the reports demonstrate that the requirements for each company are listed separately and that splash guards bearing the FORD mark fall under the section marked "POWERFLOW CANADA REQUIREMENTS ONLY." *See* Ryther Decl. D0334. Finally, there is no evidence

21

establishing that Powerflow assisted in shipping FORD splash guards from Staroba in

Buffalo, New York, to Powerflow Products in Canada.  The only evidence Ford presents

to support this accusation is a Powerflow Products' receiving record which includes the

accused splash guards and indicates that the product came "via c/o Powerflow Inc."  *See*

Ward. Dep. Ex. 10.  When asked about this receiving record at his deposition, however,

Mr. Ward indicated that he did not know exactly what "via c/o Powerflow Inc." meant,

but guessed "[i]t could have been that it was a Staroba truck that went by Powerflow, Inc.

and dropped stuff on its way or there was a combination shipment coming up from

Powerflow, Inc. and this was combined for a freight rate."  *See* Ward Dep. at 162-63 &

164:2-7.  This explanation in no way supports Ford's claim that Powerflow directly

distributed or somehow assisted in the distribution of FORD splash guards to Powerflow

Products.

    As to Powerflow Products' activities, the Court does not believe that the parties

intended to prohibit or enjoin those activities in the Settlement Agreement or Consent

Judgment.  When the parties entered into the Settlement Agreement and Consent

Judgment, Ford was aware of Powerflow Products and its sale in Canada of splash guards

bearing Ford's trademarks.  Nevertheless, Ford did not seek to add Powerflow Products

as a party to the lawsuit and the parties did not expressly refer to the company by name in

the Settlement Agreement.  Ford argues that there was no reason for the parties to refer to

Powerflow Products by name because they used the word "affiliate" in the Settlement

Agreement.  When the Court inquired at the July 13 motion hearing, however, Ford's

counsel could not cite any authority supporting Ford's assertion that Powerflow Products

is an affiliate of Powerflow.  Absent authority suggesting otherwise, the Court concludes

that Powerflow Products is not an affiliate of Powerflow as there is no evidence that

Powerflow controls or is the parent corporation of Powerflow Products.[5]  Further

supporting the Court's conclusion that the parties did not intend to regulate Powerflow

Products' activities in the Settlement Agreement is the fact that the agreement refers only

to Ford's United States trademarks which do not grant Ford any power to restrict conduct

outside the United States.

The Court therefore concludes that Ford has failed to establish a violation of the

Settlement Agreement or Consent Judgment by Powerflow, Powerflow Products, or Mr.

Ward.

Accordingly,

**IT IS ORDERED**, that Ford Motor Company's Motion for Order to Show Cause

Why Powerflow Should not be Held in Contempt of the Court's Consent Judgment is

**DENIED**;

---

[5]The Court notes that Black's Law Dictionary defines an "affiliate" as follows:

1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation company.
2. One who controls, is controlled by, or is under common control with an issuer of a security.

*Black's Law Dictionary* (8th ed. 2004).

23

**IT IS FURTHER ORDERED**, that Ford Motor Company's Motion to Enforce Settlement Agreement Against Powerflow, Inc. is **DENIED**;

**IT IS FURTHER ORDERED**, that Powerflow, Inc.'s Motion to Dismiss Ford's Motion for Order to Show Cause Based Upon Laches is **GRANTED**;

**IT IS FURTHER ORDERED**, that Powerflow, Inc.'s Motion to Dismiss Ford's Motion for Order to Show Cause Based Upon Failure to Prosecute is **DENIED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Kathleen A. Lang, Esq.
Scott R. Ryther, Esq.
Leigh C. Taggart, Esq.
George L. Pinchak, Esq.